THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, complainant-respondent,

v.

BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON, JOSEPH B. PAYTON, JAMES BILLINGTON and CHARLES A. MOORE, as boulevard commissioners of the county of Hudson, and the CITY OF BAYONNE, defendants-appellants.

[Submitted May term, 1925.    Decided October 19th, 1925.]

Where it appeared that a railroad company granted, in 1892, to the boulevard commission of Hudson county the right to construct and maintain an overhead bridge, on the former's right of way, in continuation of a boulevard laid out and constructed by the commission, "for so long as the boulevard shall be and remain a public road," and since the making of the grant a public necessity arose in that, in order to safely carry passengers and properly provide for interstate, intrastate and water-borne traffic a more efficient bridge was required to replace the old one across the Newark bay, in conjunction with the railroad company's safe and proper use of its right of way, which new bridge was authorized by the federal government, and where it further appeared that in the use of the newly-erected bridge by the railroad company it required, in turn, the elevation of the company's tracks to such a higher level as would necessitate a change in the location of the boulevard bridge and in the method crossing the railroad company's right of way, and that the municipality and the railroad company had failed to agree as to how and in what manner their respective easement shall be used and enjoyed. *Held*, that the court of chancery had jurisdiction to settle the controversy and to authorize a crossing under grade, notwithstanding that the original grant from the railroad company was for a period as long as the boulevard should be used as a public road.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Church.

*Mr. Thomas F. Meehan* and *Mr. John J. Fallon*, for the board of chosen freeholders and boulevard commissioners, appellants.

*Mr. James Benny,* for the city of Bayonne.

*Messrs. Lindabury, Depue & Faulks, Mr. Charles E. Miller, Mr. Frederic J. Faulks, Mr. George Homes (Mr. Richard V. Lindabury,* of counsel), for the respondents.

The opinion of the court was delivered by

KALISCH, J.

The object of the complainant's suit, as disclosed by its bill of complaint, was to invoke judicial action and determination of the court of chancery of a conflict which has arisen between the complainant, Central Railroad Company, and the Hudson county boulevard commissioners, as to the manner in which their respective easement shall be used and exercised in the existing crossing of the main line of the railroad company between Avenues A and C in the city of Bayonne, where the Hudson Boulevard, by means of an overhead bridge, is continued across the right of way of the railroad company. The boulevard was opened and constructed in 1892 and crosses the main line of the railroad about one thousand seven hundred feet east of the easterly end of the railroad company's bridge across Newark bay. This bridge was constructed in 1860 or 1861 and contained two draw openings each seventy-five feet in width, and was about four feet above mean high water.

Later, in 1904 and 1905, the draws were reconstructed to increase the openings to eighty-five feet. The increase in both rail and water traffic made it necessary for the railroad company to replace the bridge by another which would meet the requirements of both conditions.

To promptly meet the exigency the complainant obtained an act of congress approved February 15th, 1921, authorizing the construction and maintenance of a new bridge with approaches thereto across Newark bay. The plans and specifications were duly approved by the secretary of war and chief of engineers on December 29th, 1922. These plans and specifications required the construction of a bridge of which the draw openings shall have a clearance of not less than

thirty-five feet above mean high water, and a width of one hundred and twenty-five feet on the easterly side and two hundred feet on the westerly side. the widths to be at right angles to the channel. The company commenced the construction of the bridge in the early part of 1923, and it places the estimated cost of the structure, exclusive of the approaches and changes in the main line, at $8,500,000, and further shows that it has already expended in excess of $6,000,000 thus far on the work done and to be done. It is apparent that the old bridge is inadequate to provide with any degree of efficiency for water-borne and railroad traffic, since it is quite evident that from the lowness of the superstructure and width of its draw openings it is impossible for vessels to pass through the draws without opening them, and hence the result is that on account of the great increase in the water-borne traffic the draws are required to be opened with much frequency, and this, in turn, operates to delay and obstruct interstate and intrastate commerce carried on by both land and water. It is obvious to the contemplative mind that the evil pointed out has not only a decided tendency to seriously interrupt commerce, but as a natural consequence to derange, also, the schedule of the running time of trains prescribed and adopted by the railroad company for the purpose, among other things, to insure regularity in the operation of its trains and to indicate their position during the journey and thereby guard the lives of the traveling public and the railroad employes against accidents.

Confronted with such a situation which involved, not only a menace to human life, but a serious check upon the transportation of commodities by land and water, it was not only a moral but a legal duty incumbent upon the railroad company to take prompt measures to remedy the evil. The complainant obtained an act of congress to that end, as above referred to.

It is made quite clear that, in order to make the new bridge across the Newark bay available for the running of the company's trains over it, it will be necessary to raise its tracks where the same are crossed by the boulevard about

thirteen feet. This will operate to do away with the boulevard bridge. It is pointed out that "the grade of the boulevard bridge and its approaches is now so steep that it will be impracticable to raise the bridge to the height necessary to provide the present clearance, which is the standard on complainant's railroad, and necessary for the proper operation thereof over said tracks when so raised."

And it is further made to appear that, in order to permit the use of the lands owned by the complainant both for the purpose of the operation of its railroad and for public travel on the boulevard across the same, it will be necessary to depress the boulevard and carry it under the complainant's tracks.

In these circumstances the complainant's bill avers that for the purpose of securing the consent of the board of freeholders and the boulevard commissioners of Hudson county to such a change of grade as is above indicated, it entered with them into negotiations to that end, but without success.

The defense is interposed by the county boards to the complainant's bill is that the complainant, on September 1st, 1892, granted to the board of chosen freeholders the right, license and privilege of entering in and upon the lands of the complainant (describing the *locus in quo*) for the purpose of constructing and maintaining an elevated or overhead bridge and the approaches thereto, &c., and that said contract is still in force and effect, and, as a consequence, the county has a vested right to maintain the bridge as it at present exists, and which right cannot be impaired or disturbed.

As a further defense it was insisted that the court of chancery was without jurisdiction to take cognizance of the subject-matter in controversy.

The learned vice-chancellor, after a hearing in which testimony was taken, tending to show the necessity of a change at the crossing and the necessity for the removal of the overhead bridge, and having had before him the various plans proposed to properly meet the situation which presented itself, decreed as follows:

"1. That the public interest requires that the overhead bridge by which the public road known as the Hudson County Boulevard heretofore opened and now maintained across the main line of complainant's railroad between Avenue A and Avenue C in the city of Bayonne, in the county of Hudson, at a point one thousand seven hundred feet or thereabouts east of the easterly shore of Newark bay, together with the approaches to such bridge, shall be removed, and that in lieu thereof there shall be constructed and maintained an underpass and approaches thereto by means of which said Hudson County Boulevard shall cross under instead of over said railroad of complainant.

"2. That the said underpass shall be the one designated as plan C upon the hearing herein, and said underpass and its approaches shall be located, constructed and maintained as shown on the three blueprint maps attached hereto and marked, respectively, C-1 and C-2, which said maps are made part of this decree."

The appellants, the board of chosen freeholders of Hudson county and the boulevard commissioners of that county, appeal from the decree upon the sole ground that the court of chancery was "without authority to make such decree," whereas the city of Bayonne, a party defendant to the proceeding and more nearly affected by the result, since the crossing, where the contemplated changes are to be made, is within the city limits, has acquiesced in the decree.

In support of the contention that the court of chancery was without authority to make the decree, counsel of appellants argue that, in view of the fact that the grant made by the railroad company to the board of chosen freeholders of Hudson county provides that the overhead bridge and approaches thereto should be for "so long as said public road shall be and remain a public road under and in pursuance of the act and the acts supplemental thereto and amendatory thereof, authorizing the same to be laid out, constructed, maintained and improved," the board of freeholders acquired an easement "to endure as long as the right of way thus granted should be used for public road purposes," and that the public right

to the easement created by the grant can only be released, in the absence of the consent of the county officials under legislative authority therefor, by the legislature itself.

We think the construction sought to be put upon the grant by counsel of appellants, namely, that the method by and the manner in which the use of such easements shall be exercised by the respective parties can only be altered by their mutual consent or in the absence thereof by legislative sanction, is unsound.

This contention ignores a controlling circumstance in this case, in that the easements were to be enjoyed in common by the contracting parties. At the time of the grant a continuation of the boulevard by means of an overhead bridge at the crossing was deemed to be an appropriate way for the use and enjoyment by the appellants of their easement and compatible and in harmony with the use and enjoyment by the railroad company of its easement, at the crossing, in connection with the use of its bridge over the Newark bay as then constructed.

Now, it seems to us, if we were to give heed to the appellant's contention, it would lead to the absurd result that because in 1892 they had acquired, by grant, a right to construct and maintain the boulevard bridge, so long as the boulevard remained in existence, a method of crossing apparently in harmony with the exercise by the complainant of its easement, such manner of use of the easements must remain unchanged unless by consent of the parties or by legislative sanction, even though the boulevard became as ancient as the Appian Way, and even though it appeared, as here, that since the time of the making of the grant traffic by land and water has increased to such an extent that the complainant's bridge had become wholly inadequate to meet the demands of interstate and intrastate commerce, and the proper and safe conduct of passenger and freight trains over it, the movements of which were being seriously deranged and interfered with by reason of the incapacity of the bridge with its draws to efficiently take care of the increase in the water-borne traffic, since the bridge was constructed, some

sixty years ago. We have already observed that congress recognized the need of a new bridge to supplant the old, by passing an act authorizing its construction, and that the bridge has been constructed and is in process of completion according to plans approved by governmental authorities.

That the court of chancery had jurisdiction to take cognizance of the controversy between the parties and to grant relief by fixing and determine how the respective easements shall be used and enjoyed in the situation disclosed by the evidence cannot be successfully questioned.

In *Delaware, Lackawanna and Western Railroad Co.* v. *Erie Railroad Co., 21 N. J. Eq. 298,* Chief-Justice Beasley speaks trenchantly on the subject in hand (at *p. 304*), where he says: "In the case before me these parties possess a community of interest in this property. They are tenants in common of an easement, and if this court cannot protect the one against the injustice of the other, the party whose rights are invaded is clearly without any adequate remedy, for it is certain that either of these companies, thus situated, can so act with respect to the common easement as to render it worthless to the other, and thus bring upon the latter incalculable mischief." And, again, further along, speaking of the nature of railroad companies, he says: "In truth, as these companies, although technically private corporations, are in some measure public agents, there exists in such cases as the present an additional reason why a judicial control should be extended as far as possible over their conduct towards each other. I have no doubt as to the jurisdiction of this court over this subject, and shall not scruple, therefore, to exercise it to the fullest extent that the circumstances of the case may now, or at any time hereafter, appear to require."

In commenting upon this language, Vice-Chancellor Grey, in *Palmyra* v. *Pennsylvania Railroad Co., 62 N. J. Eq.* (at *p. 617*); affirmed by this court in *63 N. J. Eq.* (at *p. 799*), says: "The principle is the same where a dispute arises between a railroad company and a municipality as to their respective use of a highway crossing a railway."

The circumstance that in the present case the grant of the railroad company contained an express agreement on its part that the municipality shall have the right to construct and maintain an overhead boulevard bridge at the crossing, so long as the boulevard itself shall exist, seems to us to be inconsequential, in view of the fact that each of the contracting parties was charged with the performance of public duties to be properly exercised in the public interest, and we must assume in that regard that the method and means agreed upon between the parties as to how and in what manner the easements of the respective parties shall be used and exercised were predicated upon the situation and conditions which were then prevailing, and in a measure controlling, and presumably upon the theory to continue only so long as such conditions should remain the same. But whether this be so or not, it is quite clear that the municipality cannot with legal propriety insist upon the enforcement of the grant of easement to it, to be used and exercised by it, in the manner evidenced by the terms of that instrument, since it appears here that to enforce the terms of the grant would render incalculable mischief to the railroad company in the enjoyment of the easement, in common with the municipality, imperil the safety of the traveling public and obstruct interstate and intrastate commerce.

The municipality and the railroad company being unable to agree as to the method and manner of the use and enjoyment of the easement by the municipality in which easement, as has already been observed, the railroad has an interest in common with the municipality, and a public necessity having arisen for a change at the crossing, it was clearly within the jurisdiction of the court of chancery to intervene and fix and settle the terms and conditions of the use and enjoyment of such easement by the municipality and the railroad company.

The decree of the court of chancery is affirmed, with costs.

The vote in each of the three cases here decided was as follows:

For affirmance—THE CHIEF-JUSTICE, TRENCHARD, PAR-
KER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL,
LLOYD, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON,
KAYS, JJ. 14.

For reversal—None.